# Evans's Appeal.

1. A will may be cancelled by an act done to the will which stamps upon it an intention that it shall have no effect, though the act be not a complete obliteration or physical destruction.

2. "Obliteration" in the Wills Act is not confined to effacing the letters so that they cannot be read. A line drawn through the writing is obliteration, though it may leave it as legible as before.

3. The words "*burning*," "*cancelling*," "*obliterating*" and "*destroying*," in the act are used in their popular sense, and thus used secure the object of the legislature—a complete manifestation of an executed intention to repeal.

4. *Cancellation* of a will means any act done to it which in common understanding is regarded as cancellation when done to any other instrument. It must be an act done to the will itself, *animo cancellandi*.

[Evans's Appeal.]

5. Declarations either verbal or written are admissible to show the intent.

6. Revocation of a will may be effected by *act* of writing *on the will itself* a word which manifests an intent to annul it.

7. Cancellation does not require a signature of any particular form.

8. As distinguished from destruction, cancellation implies a preservation of the instrument, but with something on it indicative that it has ceased to be operative: it is not material what, if it clearly exhibits the intention to annul.

9. Where a will is signed several times and also at its end it is the last which makes it a will and its erasure repeals the will.

10. A repeal is effected by writing *on* the *will* a word manifesting an intention to annul it.

April 1st 1868.    Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

Appeal by Edmund G. Evans from the decree of the Register's Court of *Philadelphia* admitting to probate a paper writing purporting to be the will of Rowland E. Evans, deceased.

The writing was all on the same sheet of paper, and was presented for probate to the register of wills of Philadelphia on the 14th of May 1866, in the condition here indicated.

"I give and bequeath all my estate, real, personal and mixed, to my brothers Edmund, William, and Manlius, in trust out of the income,[1] after paying my debts, taxes and expenses, in the first place to pay the sum of one thousand dollars a year, in quarter-yearly payments to my sisters Julianna and Margaret and the survivors of them during life. In the second place to pay the sum of twenty-five hundred dollars to my brother Cadwalader, with[1] interest from the day of my death. In the third place to invest the surplus income and its increase to be added to my residuary estate. In the fourth place[1] all the residue of my estate and its increase shall, on the death of my said sisters and the arrival at the age of twenty-one years of my youngest nephew hereinafter mentioned, born during the life of either of my said sisters, be divided into as many equal parts as may be necessary to supply the following legacies and devises: And one of those equal parts I give to the son or sons, living at the time of the said last-mentioned death of my brother Edmund: One other of those equal parts to the son or sons then living of my brother William: One other of those equal parts to the son or sons then living of my brother Manlius: (Here was a line and a half erased so as to be illegible.) And if any of said nephews should then be dead leaving a son, such son or sons shall stand in the place of his father and take the share. I give my library to my nephew Cadwalader Evans. I constitute the said Edmund, William and Manlius the executors of this will—and I authorize them with the consent of the said Julianna and Margaret if living to raise money by selling stocks or otherwise for the purpose of improving real estate, and also, with the same consent to sell real estate if they

---

[1] Tears.

[Evans's Appeal.]

shall deem it expedient, but and they shall not change any investment without such consent. Witness my hand, an erasure having been made in the third line from the top, the 19th line and part of 20th line having been erased and an erasure and interlineation to the 28th line, this twenty-fourth day of May, A. D. 1856.

ROWLAND E. EVANS.

"If an*y*[1] one of the classes of persons to[1] whom the residuary estate is given above should fail, the residuary estate shall be equally divided between the other two classes, each class taking one-half,[1] and if two of the said classes should fail the remaining class shall take the whole residuary estate. The word erased is somewhat blurred in the 31st line from[1] the top.

ROWLAND E. EVANS.

May 24th 1856.

The above will and codicil were signed
    and published in the presence of us,
    who have subscribed in presence of
    each other and of the testator.
        JOHN HORN, JR.,
        THOS. A. BIDDLE.

"I hereby revoke the annuity of one thousand dollars, given within to my sisters, and direct that the trustees shall hold the property given to them, free from the same and subject to the other trusts exclusively.

"I hereby strike out the words 'the death of my said sisters and.' I also substitute for the words 'born during the life of either of my said sisters' the words 'born during my life,' and I direct that the will shall be construed as if these two alterations had been actually made and before its execution. I also direct that the consent of my sisters shall not be necessary, as provided therein, but the consent of all the trustees for the time being shall be necessary to the sale, mortgage or other proceeding. I revoke the gift of my library and give it with my watches, rings, seals and furniture, to my brothers Edmund, William and Manlius. Witness my hand this 21st of July, A. D. 1858.

ROWLAND E. EVANS.

Cancelled.

Signed and published by the testator
    in the presence of both the under-
    signed, that is, the undersigned
    being *then* present together.
        JAMES MARKOE,
        WILL. B. NORRIS.

ENDORSED.—WILL."
        Cancelled.

[1] Tears.

The tears appear to have been made across the foldings of the paper.

Horn, one of the subscribing witnesses, testified that he had no knowledge of attesting the will, except seeing his name to it; he thought the word "cancelled," on the back of the will, not the testator's writing: the signature at the foot of the first page which is erased he thought was the testator's writing: also the unerased signature on the first page.

Biddle, the other witness, testified that both the erased and unerased signature were the testator's writing, but he could not speak from positive recollection of having seen testator sign it.

Manlius G. Evans testified: "I am the brother of Mr. Rowland E. Evans; am named in the will as one of the executors; I found this paper among some of my brother's papers. It was in just the same condition as you see it, as regards the text. The word 'cancelled,' I have no doubt it is in his handwriting. I found it, the will, in a bookcase, behind the books, in a box, bound as a pamphlet, to represent a book and endorsed pamphlet. In the box were papers of little or no value, and with this will the draft of another, in its general provisions similar to this, and unexecuted."

June 7th 1866, the register refused probate of the paper.

Manlius G. Evans appealed to the Register's Court.

December 22d 1866, the Register's Court reversed the decree of the register, refusing probate of the paper as the will of Rowland E. Evans.

Edmund G. Evans appealed to the Supreme Court.

*R. C. Murtrie* and *G. W. Biddle*, for appellant, cited Hays *v.* Harden, 6 Barr 409; Wickoff's Appeal, 3 Harris 290; Bibb *v.* Thomas, 2 W. Bl. 1043; Reed *v.* Harris, 6 A. & E. 209; Perkes *v.* Perkes, 3 B. & Ald. 489; 2 Bl. Com. 376, Chitty's note; Onions *v.* Fryers, 1 Eq. C. Ab. 408; Lewis *v.* Lewis, 2 W. & S. 455.

*P. McCall*, for appellee: Hays *v.* Harden, Lewis *v.* Lewis, Wykoff's Appeal, Bibb *v.* Thomas, Reed *v.* Harris, *supra;* Heise *v.* Heise, 7 Casey 246; Stephens *v.* Taprell, 2 Curteis 458; Grantley *v.* Garthwaite, 2 Russ. 90; In Re Brewster, 6 Jur. 56; Price *v.* Powell, 3 Hurlst. & Norman 341; Clingan *v.* Micheltree, 7 Casey 25; Worthington on Wills 531; Bigge *v.* Bigge, 6 Jur. 192.

The opinion of the court was delivered, May 7th 1868, by

STRONG, J.—The facts out of which the question raised by this appeal arises, are briefly these: Before his death, Rowland E. Evans, the decedent, wrote a testamentary paper, bearing date May 24th 1856, and signed it either then, or on some succeeding

8 P. F. SMITH—16

day. Immediately after the signature, and in close juxtaposition with it, he wrote ,a brief addition, merely directing what should be done if any one of the classes to whom he had given his residuary estate should fail, and noticing that a word in the thirty-first line was somewhat blurred. This addition was also dated May 24th 1856, and it was signed. There is no evidence, other than that which arises from the dates, when either of these signatures was made, unless it is found in an attestation clause following the last signature, and signed by two witnesses after the middle of June 1856. The clause is as follows: "The above will and codicil were signed and published in the presence of us, who have subscribed in the presence of each other and of the testator." There was no other attestation clause attending the first signature of the decedent.

On the other side of the sheet upon which the foregoing had been written, the decedent subsequently wrote and signed another testamentary paper or codicil dated July 21st 1858. This was attested by two other witnesses. The will and codicil or codicils being all upon one sheet of paper, it was folded and endorsed in the handwriting of the decedent, "will."

After his death the paper was found in a book-case, behind the books, in a paper box, bound as a pamphlet, representing a book, but endorsed as a pamphlet. In the box were other papers of little or no value, and the draft of another will unexecuted. The condition of the paper when found was this: the word "will," with which it had been endorsed, was erased by an ink line drawn through it, and immediately thereunder, close to it was written in the decedent's handwriting the word "cancelled." The signature of the codicil of July 21st 1858 was erased, and the word "cancelled" written under it. The signature to the addition dated May 24th 1856 was also erased, but the other signature remained. The paper had two rents perpendicular to the folding, extending from one-quarter to one-third across the fold, and making four considerable rents when the sheet was unfolded. Upon this state of facts we are to determine whether the will had been revoked, or, in the language of the statute, repealed.

Our Statute of Wills of 1833 enacts that no will in writing, concerning any real estate, shall be repealed, nor any devise or direction therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the same manner as is provided in regard to the execution of wills, or by burning, cancelling, obliterating or destroying the same by the testator himself, or by some one in his presence and by his express direction. A similar provision is made in regard to wills respecting any personal estate, adding only, as a mode of repeal, a nuncupative will. There are then two modes under the statute, and only two, in which wills executed

according to the required forms of law can be rendered of no effect, if we except revocation by a nuncupative will, which this case does not call upon us to consider. One of these modes is by another will, or codicil, or other writing, declaring a repeal. This is revocation by another and distinct instrument of writing. It works the repeal by force of the words contained in the new instrument. But to enable the will, codicil or other writing to have such an effect, it must itself be complete, executed and proved in the prescribed manner, namely, as a will. The other mode of repeal is something done to the will itself, something more than mere intention expressed. It must be intention to annul carried into execution by acts done to the paper. This mode is described in the statute as " burning, cancelling, or obliterating, or destroying the same," (that is, the written will), by the testator himself, or by some one in his presence, and by his express direction. It is not claimed in this case that the will of Mr. Evans was repealed in the mode first above-mentioned, but the ground taken by the appellant is that it was annulled in the second mode, by cancellation and destruction. The statute does not declare what shall amount to cancellation. The word is not a technical one, and therefore the legislature must be presumed to have used it in its ordinary and commonly understood sense. It amounts to nothing to show what the original etymological meaning of the word " cancel" was. Long before the statute was passed, it had acquired an accommodated meaning, plain to the common understanding. To most minds it did not suggest a thought of its primary signification. No one supposed that when a cancelled bond, or note, or power of attorney was spoken of, it was intended exclusively a bond, note or power over which lattice-work lines had been drawn. No one would have doubted that drawing parallel lines or curved lines across a bond, or a single line through its signature, would amount to cancellation, if done with an intent to annul the instrument. Nor would any one have doubted that writing the word " cancelled," or the word " annulled," upon any other instrument than a will, would be an act of cancellation, and effective as such, if done by one who had authority to destroy it, and with an intent to destroy. The reason is that the act puts the instrument into such a condition, that it shows on its face its invalidity the moment it is produced. It is a common, ordinary mode in which writings are annulled, and the act of cancellation being palpable, and inseparable from the writing, there can be no mistake in regard to an executed intention to render it of no effect. How then can it be maintained that the word " cancelling" was used in the statute in any peculiar sense? Why, as it confessedly may be, in case of a bond, note, check, letter of attorney or any other instrument, may not a will be cancelled, not by words alone, not by words in writing alone, but by an act done to the will which

stamps upon it an intention that it shall have no effect, though the act done be not complete obliteration, or physical destruction? Can it be that a will may be repealed by straight or crooked lines drawn upon it, and yet not by lines in such form as to express words? Putting the one on the paper is as much an act done to it, as is writing the other, and no more, but the latter may indicate the purpose of the act more clearly than the former can. It is true we have to do with the meaning of the words "cancelling," "obliterating" and "destroying," as used by the legislature, but there is nothing in the statute that requires us to attach to them any unusual signification. Let it be admitted that, collocated as they are, we are required to consider them as defining acts of a similar nature. We do. All are acts done to the will itself, and they are not used in their absolutely literal sense. Even burning does not mean entire consumption by fire. This is not claimed, and under a statute very similar, it has been so ruled: Bibb ex dem. Mole *v.* Thomas, 2 Wm. Blackstone 1043; Reed *v.* Harris, 33 Eng. C. L. 57. Nor is obliteration, as meant in the act, nothing short of effacing the letters of the will, scratching them out or blotting them so completely that they cannot be read. A line drawn through the writing is, doubtless, obliteration, though it may leave it as legible as it was before. So the destruction spoken of is not necessarily annihilation, or a change into other forms of matter. Tearing into fragments is unquestionably destruction, though the fragments may be reunited. All the words are used in their popular sense, and thus used they secure the object the legislature had in view, a complete manifestation of an executed intention to repeal. Each word is expressive by an act done to the paper itself, a mark upon it, evincible of a present intent that it shall not operate as a will.

Revocation by cancellation then is not to be understood to mean exclusively drawing crossed lines upon the paper, but it means any act done to it, which, in common understanding, is regarded as cancellation, when done to any other instrument. Undoubtedly it must be an act done to the will itself, and it must be done *animo cancellandi.* In Williams on Executors 110, the doctrine is thus stated: "The principle appears to have been established that if the intention to revoke is apparent, an act of destruction or cancellation should carry such intention into effect, although not literally an effectual destruction or cancellation, provided the testator had completed all he designed to do for that purpose."

Turning now to the facts of the case, we cannot doubt that there was an intention of the decedent to repeal his will, and that the intention was executed. It is impossible to look at the paper without seeing that he did *to it* something plainly showing his intent that it should have no operation. Were there nothing more than the erasure of the last signature to the writing dated May

[Evans's Appeal.]

24th 1856, it would be difficult to escape from the conviction that it was an act of repeal annulling all that preceded that signature. The paper first written and the addition, according to the most familiar rules of construction, constituted but one instrument. They were dated on the same day. They were attested at the same time, and by a single attestation. The attestation clause speaks of them both as having been signed in the presence of the witnesses, and as there is no evidence that there was more than one occasion when they were called upon to attest the signatures, it is a legitimate presumption that they were made at the same time. The subject of the addition also leads to the conviction that it was made contemporaneously with the part preceding. It is the completion of a partly expressed testamentary disposition, with a reference to a blot as if it was in the instrument which the testator was then writing. In view of these considerations the fact that the paper exhibits a signature preceding the added sentence, is of not much importance. Even if it was made before the supplementary clause was written (which, however, is contradicted by the subsequent attestation clause), it is evident the will was not laid aside as complete until the final signature was written. It is not uncommon for a testator to sign his name repeatedly to a testamentary paper. He sometimes signs each sheet, sometimes at the close of every disposition, and again at the end. It is the last which consummates the instrument, and makes it a will, and the erasure of the last works a repeal of the whole instrument. If then the writing dated May 24th 1856, were executed at the same time, and together constituted but one will, the obliteration of the final signature was an annulling of the whole.

This, however, is not all. It has been noticed that the paper when found after the death of Mr. Evans, exhibited two rents across the folds, such as are frequently made with a purpose to destroy. That the rents did not reach to complete physical destruction, is true, but this is not necessary to amount to that destruction which the Act of Assembly recognises as a mode of repeal. Our statute is very like the British statute, and those of some of our sister states, under which it has always been held that partial destruction, even slight, is sufficient, if accompanied by an intent to annul the will. Said Lord Chief Justice De Grey, 2 W. Black. 1043 : " The statute has specified four modes of revocation, and if these, or any of them, are performed in the slightest manner, this, joined with the declared intent, will be a good revocation." See also 1 Jarman on Wills 132 ; Abraham *v.* Joseph, 3 Hurl. & Nor. 350 ; Re Simpson, 5 Jur. N. S. 1366 ; 4 Mass. 460. Undoubtedly if the tearing in this case was accidental, or if it was purposely done, but without any intent to destroy the will, it amounts to nothing. There must be both an act and an intent concurring. But were there evidence that at the time the rents

were made Mr. Evans had said, "I revoke this will," or "This is no longer my will," beyond doubt the act done would have been effectual to work a revocation. Declarations both verbal and written are admitted to show with what intent an act of apparent destruction or cancellation was done. In this case the legal presumption is that the tearing was done by the testator. He only had custody of the will. Was the tearing accidental or intended as an act of revocation? The erasure of the endorsement on the will, the writing on it the word "cancelled," the erasure of the signatures, if they show nothing more, exhibit this, that there was an intent to annul the instrument. It is said there is nothing to connect these acts with that of tearing, so as to warrant their being used to give character to it. But they are connected by the fact that they are all acts of apparent attempted destruction, done to the same writing, and, therefore, we think it a fair inference from the endorsement and erasure, that the act of tearing was *animo revocandi*. Conceding, then, that the two rents across the folds of the paper were not decisive of the intent with which they were made, the other evidence throws light upon it, and it is to be regarded as explanatory, independent of its own peculiar effect.

There is yet another view of this case. It relates to the effect of the testator's erasing the endorsement upon the will, and writing under it the word "cancelled," when he had written the same word under the codicil of July 21st 1858, and had erased the signature to that and the last signature to the papers dated May 24th 1855. It is to be considered now without reference to any act of tearing. Was this cancellation? Were the question presented to the common mind the verdict would not be a moment in doubt. There are both the intent to cancel and the act done in pursuance of it. True, there was no revocation or repeal by mere force of the word "cancelled." Neither that word, nor any other would suffice if written on a separate paper. But, I think, a repeal is effected by the *act* of writing *upon the will itself* a word that manifests an intention to annul it. Such an act is a mode of repeal, of the second kind recognised by the legislature, a thing done to the paper on which the will is written. It would be strange if drawing ink lines across the will without obliterating a word, should amount to cancellation, and writing on it words that leave no doubt of an intent to cancel, should be anything less. It is plain that cancellation does not require a signature under the statute, nor is any form of cancellation required. As distinguished from destruction, it implies a preservation of the instrument, but with something upon it indicative that it has ceased to be operative. What that something is cannot be material, if it clearly exhibits a testator's intent to annul. In Warner *v.* Warner's Estate, 37 Vt. 356, there is a case very like the present.

The Vermont Statute of Wills is similar to ours, though it requires attestation by subscribing witnesses. It prescribes as the only modes in which a will duly executed may be revoked, first, by some will, codicil or other writing, and secondly, by tearing, cancelling or obliterating. Under this statute, the question arose, in the case cited, whether a will had been cancelled. The paper propounded for probate was dated August 22d 1857. It was all in the handwriting of the deceased, except the names of the witnesses, and it was duly attested and published. It was folded and endorsed in the handwriting of the deceased: "Isaac Warner's last will and testament."

The will was written upon one sheet of foolscap paper, covering the first page and about one-third of the second. Thus far there were no marks of obliteration, cancellation or defacement upon it. But upon the last half of the second page were written the following words: "This will is hereby cancelled and annulled in full, this 15th day of March in the year 1859." Several lines lower down on the page were the following words erased: "In testimony whereof I here I have." On the fourth page of the sheet, written lengthwise of the sheet, as folded, and below the endorsement upon the back, were these words in the testator's handwriting: "Cancelled and is null and void, I. Warner." It was conceded by counsel, and declared by the court that the will was not revoked in the first statutory mode of revocation, that is by a will, codicil or other writing. The words of attempted revocation were not attested by subscribing witnesses. They had, therefore, no operation as a will or other writing. But it was ruled that the will was cancelled within the meaning of the statute. It was considered that in the writing were combined both an act done to the paper, and inseparable from it, without destroying some of its words, and a declaration of intention. The case rests upon the position that by his act, though the act was writing, the testator had put the paper in such a condition, that when produced it showed his intent to annul it. Hence it was adjudged cancelled. The case contains a full and able discussion of the subject, quite satisfactory to us, and in harmony with our convictions. And there is no case in conflict with it. Mr. Redfield, in his Treatise on Wills, page 318, expresses doubts whether Warner v. Warner was correctly decided. His doubts appear to rest on the supposition that cancelling must mean erasure of some portion of the writing, a supposition which does not appear to be founded in the best reason, and they overlook entirely the grand purpose of the legislature, which was to secure substance rather than form, and demand an unequivocal and permanent manifestation of the will to revoke.

We are referred by the counsel for the appellees to Grantly v. Garthwaite, 2 Russ. 90, where it appeared that the words "last

will and testament," endorsed on the envelope of a will, had been erased, and the word "superseded" written in the testator's handwriting. The will was held not revoked. But the facts must be carefully noted. The will itself was enclosed in an envelope, and both were enclosed with an unattested draft of another will in another envelope. It was upon this second envelope the erasure was made and the word "superseded" written. Nothing was done to the will itself. It bore no mark of revocation, nothing to show the testator's intention that it should not continue in force. It was necessary to look beyond the instrument, or the paper on which it had been written, to discover either an act or intention of revocation. In re Brewster, 6 Jur. 56, is also cited. There it appeared that the testator had written across his signature, " cancelled, Wm. B.," and below the names of the attesting witnesses, " Mem., I hereby declare this will revoked and altogether cancelled, the bequests and other arrangements being rendered nugatory, &c. I intend to make another will, whereupon I shall destroy this, Wm. Brewster." Sir Cresswell Cresswell considered the testator had done no sufficient act in law to effect a revocation, and he admitted the will to probate. He gave no reasons for his decision, but they are manifest. What the testator wrote on the will showed that he intended only a future revocation. He designed to make another will, and *then* to destroy the one he had made. From this it was inferable he did not regard his act as an accomplished repeal.

The case which comes nearest to the support of the case of the appellees is Lewis v. Lewis, 2 W. & S. 455. There the testator had written on the margin of the first page of his will, " obsolete." Whether the word referred to the whole will, or to the clause opposite to which it was written, was doubtful, but it was assumed to refer to the whole, and this court held the will not cancelled or revoked. Writing that word on the margin was, in the judgment of the court, neither a burning, cancelling, obliterating or destroying the will. Of course it was not a repeal by another will, codicil or writing. But it should be observed that though the word was written upon the paper on which the will was written, it was placed where it could have been detached without defacing the instrument. It might have been separated and the will itself remained intact. In this respect it differed from the case now before us. There was also no evidence apart from what the word imported to show what was the testator's intention in writing it, and the word itself did not clearly evince an intention to repeal the will. It expressed no more than that in the testator's opinion the will was old, neglected, disused. The word " obsolete" never had the sense of annulled, revoked, repealed. It is expressive of a condition, not of an act. Revocation by an act done, as distinguished from revocation by will, codicil or other

writing declaring it, consists not only in the act but also in an accompanying clear intention to revoke, and this did not appear in Lewis *v.* Lewis, in which respect it differed widely from what appears in the present case. The decision, therefore, is not inconsistent with Warner *v.* Warner, or with the views heretofore expressed. It does not hold that a will cannot be cancelled by making marks upon it, inseparable from the will, clearly with an intent to cancel, if the marks consist of letters and words rather than lines drawn across the instrument. It does not rule that cancellation is necessarily erasure or defacement. What would have been the judgment if, instead of the word obsolete, the word cancelled had been written, and written where it could not be removed, and leave the will entire, can hardly be gathered from the case. Warner *v.* Warner does not, as it is argued, substitute the intention of the testator for the judgment of the law. The argument assumes that the statute used the word cancelled in a restricted sense, an assumption which finds no support in the law. As already remarked, that act which would be a cancellation of a bond, must be a cancellation of a will. We are not at liberty to restrict the act by reading it " cancelling by defacing some material and essential part of the script." That would make cancelling synonymous with obliteration. But without extending our remarks further, we conclude by expressing our opinion that the will of Mr. Evans was repealed by the acts of him done to it.

> The decree of the Register's Court is therefore reversed, and that of the register affirmed.